BUTLER (KIMBERLY v.). See Case No. 7,-777.

## Case No. 2,242.
BUTLER v. McCLELLAN et al.

[1 Ware (219), 220; 7 Am. Jur. 70.][1]

District Court, D. Maine. Sept. 27, 1831.

SEAMEN—AUTHORITY OF MASTER—MATE'S LIABILITY FOR CARRYING OUT ORDERS — PUNISHMENT OF SEAMAN.

1. The master has the sole and exclusive command on board the vessel, and the inferior officers, as well as the common sailors, are bound to obey his lawful commands.
[Cited in Jay v. Almy, Case No. 7,236.]

2. When the mate, in obedience to the orders of the master, assists him in inflicting punishment on a seaman, he will not be held responsible as a joint trespasser, unless the punishment is obviously and grossly excessive and unjust.
[Cited in Allen v. Hallet, Case No. 223.]
[See note at end of case.]

3. When it is apparent that punishment is merited, the court will not undertake to adjust very exactly, according to its own ideas of fitness and propriety, the balance between the

[1] [Reported by Hon. Ashur Ware, District Judge. 7 Am. Jur. 70, contains only a partial report.]

gravity of the offence and the quantum of punishment, and will not award damages unless the punishment is manifestly excessive.

[Cited in Sheridan v. Furbur, Case No. 12,-761.]

[See note at end of case.]

4. The provisions of the ancient sea laws on the authority of the master to punish seamen.

[Cited in Sheridan v. Furbur, Case No. 12,-761.]

[See note at end of case.]

[5. Cited in The Guiding Star, 1 Fed. 349, to the point that the admiralty can entertain jurisdiction over actions for assault in personam only.]

In admiralty. This was a libel against the master and mate of the barque Argo, for an assault and battery of the libellant, while the barque was in the port of Matanzas, in the island of Cuba. [Decree for libellant].

The material facts are that on or about the 25th of July, in the evening, the libellant was sent in the boat with Williams, another of the crew, for the captain, who had been spending the evening on board the Eastern Star, another Portland vessel lying in the harbor. No difficulty occurred until the boat came near the Argo, when, as she was coming along-side, the captain called out to unrow, or take in the oars. The libellant, who sat in the after seat, in taking in his oar, turned the blade aft, on which the master, speaking to him in a loud and passionate tone of voice, called him a rascal, and asked him why he did not turn the blade forward. The libellant replied that the boat was so near the vessel that it was impossible. On this the captain rejoined, that if he did not turn the blade forward, he would beat out his brains with the tiller. The libellant made some answer, the words of which are not testified to, but it is described by the witnesses as being temperate and not of an irritating character, whereupon the captain gave him a blow. and the libellant cried out, "Murder!" The captain then seized him, and a scuffle ensued, during which the captain gave the libellant several blows with his hand or fist, and lost his hat overboard. Up to the time when the scuffle took place, the only witness in the boat was Williams, but at this time the mate came on board. The first that he saw was Butler hold of the captain, apparently pressing over the stern of the boat. The captain seized him by the head, and pulled it down between his knees, on which Butler again sung out, "Murder!" The mate asked him what he was about, and Butler replied, "Will you see me abused?" The captain went up the steps first, and as soon as he was on deck, stripped off his coat and took a rope, and as Butler was coming up, made several passes at him with the rope, which Butler dodged, and made his escape on deck. At this time the crew had gathered around, and witnessed the remainder of the affair. The

accounts which the different witnesses now give, though varying in some particulars, agree in substance. Some of the witnesses say that after Butler was on deck, he "squared away," that is, as the phrase is explained, he held up his hands towards the captain, and put himself in an attitude to attack him; others say that his attitude was that of defence, and to ward off the blows of the captain, who still threatened him with the rope. The captain advanced and made a pass at Butler with his fist, when he turned and fled, and in running, hit his leg against the windlass and he fell. The captain pursued him, and sprang upon him as he fell, held him down and kicked him a number of times about the head and breast. The crew collected around, and one or two of them remonstrated with the captain, and told him that he ought not to kick Butler in the face. The mate came up, and ordered the men to stand off and let the captain do as he pleased, and, on the captain's order, brought the irons and put them on, while the captain held him. Butler was then ordered to the main hatch, and the captain went below to supper. When he came up, he found Butler at the main hatch, with his hands before him, which had been ironed behind. He again ordered them behind. At this time, according to the testimony of the mate, the captain said to Butler, "I'll teach you to clench me in the boat,"—to which Butler replied, that he did nothing but defend himself. The captain rejoined, "I'll teach you to defend yourself," and gave him a blow with a rope; other witnesses say that he gave him several blows. The captain then lashed him to the ring-bolt of the main hatch, and in doing it, drew the rope with such violence around his arms as to give a good deal of pain, and though, some time after, it was loosened by one of the men, the marks remained several days. He received several wounds also on the back, at the windlass, which he showed to the crew three or four days afterwards, and which were then black and blue. He remained lashed to the ring-bolt three or four hours, when he was relieved by one of the men on the watch, and in the morning the captain ordered his irons to be taken off.

Mr. Neal, for libellant.

Mr. Anderson, for defendant.

WARE, District Judge. This case has been earnestly and eloquently argued, both for the libellant and respondent, with an apparent, and I doubt not a real conviction, on both sides, of the justice of their cause. It is not surprising that the court, bound to preserve an even and well-balanced judgment, should see it in a light somewhat different from that in which it is viewed by either of the parties, and as the counsel on both sides have expressed a wish that I should give a written opinion, and explain the principles by which

such cases are governed, I have considered it more at large than would seem to be required by the nature or importance of the case.

The libel was originally brought against the master and the mate. In the progress of the case, and after the evidence was out in support of the libel, the respondent's counsel moved to dismiss the libel as against the mate, in order to introduce him as a witness in favor of the master, on the ground that, on the libellant's own showing, there was no sufficient evidence to charge him as a trespasser. It was opposed on the ground that, by the common law, he who assists another to commit a trespass, is held as a joint trespasser. But this case is governed, not by the rules of the common, but of the marine law. By the maritime law, the captain has all the authority of command on board the vessel, and the inferior officers as well as the common seamen are bound to obey his orders. It is not, however, intended to be said that they are bound to obey all his orders, whether lawful or not. In the case put at the bar, if the captain was proceeding to inflict, in a cruel and ferocious spirit, a punishment of extraordinary severity, obviously not necessary for the preservation of subordination and discipline in the crew, and loss of life, or other serious injury should ensue, no doubt the mate or any of the crew who should aid in such excesses, though in obedience to the captain's orders, might render himself jointly responsible for the consequences. The present, however, is not such a case. And in order to render the mate civilly responsible with the captain for damage, when he is acting under the immediate orders of his superior, there must be such a manifest and gross excess of punishment, such marks of cruelty and passion, that every cool and impartial bystander would cry out on the injustice and cruelty of the punishment. In putting on the irons, the mate acted only in obedience to the express orders of the captain, and to have justified his refusal to obey, the case must have been one of manifest and gross oppression. Disobedience is held by the maritime law as an offense of the gravest and most dangerous character. The nature of the service, and the character of those employed in it, renders it necessary, for the safety of the property and lives committed to the uncertainties of a dangerous and treacherous element, exposed to risks requiring in many cases extraordinary promptitude of decision and action, that the captain should be intrusted with a large measure of discretionary authority. The hazards encountered are often of such a nature as do not admit of being met by the slow process of deliberation. If the captain was bound to consult the crew, or even his inferior officers, in emergencies, the mischief would be accomplished before the debate was brought to a close, and the ship, with the crew, would be irretrievably lost before the opinions could be collected on the best mode of warding off the danger.

The necessities of the service require a promptness of action in emergencies that excludes the possibility of acting under the deliberative direction of several minds, and the law, therefore, finding it necessary to invest the captain with a dictatorship to meet emergencies, to preserve uniformity of government, very properly gives him the entire authority or command, in all cases; but it enjoins on him the moderate and prudent use of his authority, and holds him strictly responsible for the abuse of his high powers. In some instances, the old sea laws require him, before acting, to consult with his officers, as in the case of jettison rendered necessary by stress of weather, and by the French Ordonnance he is required to take the advice of his mate and pilot before inflicting punishment on any of his men; but with the exception of particular cases, specially taken out of the general rule, the whole authority of command is invested in the captain; and these exceptions have never been understood to be incorporated into the maritime law of this country. The circumstances of this case are not such as, in my judgment, to justify the mate in a refusal to obey the orders of the captain, and the libel, as against him, is therefore dismissed. The captain's case stands on different ground from that of the mate. Though the mate might not be justified in refusing to obey the captain when he ordered him to bring and put on the irons, the captain himself, in proceeding to inflict the punishment, did it under his responsibility to the laws of his country. By the common, as well as the marine law, the master has authority over the mariners on board his vessel, and they are bound to obey all his lawful commands. In cases of disorderly and disobedient conduct, he may lawfully correct them in a moderate and reasonable manner; and this rule of temperance and moderation in punishment must necessarily depend on the particular circumstances of each case. The urgency of the occasion, the temper and conduct of the culpable party, the dispositions, state of discipline, and habits of obedience of the crew, all are elements of the case, and may go to justify a greater or less degree of severity in the punishment. The object of granting the authority to the master is to enable him to maintain his command and to preserve discipline and subordination on board his vessel; and to do this, he must have the power to enforce habits of obedience and a respectful demeanor of the crew towards himself.

As the law, in giving the rule, is unavoidably restricted to general and comprehensive terms, allowing a great latitude of discretion in its application to individual cases, it may be worth the while to enter into some detail to show how this subject of maritime police has been viewed by the old sea ordinances,

and by the text writers on maritime law, to see in what terms the rule itself is announced, and what is the general spirit and tone of the most enlightened jurisprudence with respect to its application in practice. The similarity of occupation and circumstances in life, has produced a great resemblance of manners and habits among seamen in all maritime countries. It has been remarked that the framers of ancient maritime ordinances seem studiously to have avoided the mention of this power of the master to inflict punishment on his men. The Consulate of the Sea says that the seaman is bound to obey all the orders of the master and mate, relating to the service of the ship; that a seaman who shall have a quarrel with the master shall lose half his wages, as well as his pacotille on board. and be expelled from the vessel; and if he shall employ arms against the master, the other seamen shall seize and bind him, put him in prison, and deliver him into the hands of justice. If he strikes his master, he shall be considered as a perjured traitor, and forfeit all he has. The seamen also ought to bear with the master if he uses towards him reproachful language; and if the master makes an assault upon him, he ought to fly to the prow and put himself in the chains, and if the master follows him, he ought to retreat to the other side, but if the master still pursues him, then he may call witnesses and stand upon his defence, for the master cannot pass the chains. Chapters 162–165. The Laws of Oleron [Fed. Cas. Append.] direct the master to preserve the peace among his crew, and reconcile their differences. If one seaman gives another the lie, he shall pay a fine of four deniers before he is admitted to the common table. If the lie is given to the master the penalty is double; and the master who gives the lie to the seaman is subject to the same penalty. If the master strikes a seaman, he ought to bear the first blow, but if the master repeats it he may defend himself. He who first strikes the master shall pay a fine of one hundred sous or lose his hand, at his option—a strange punishment, but one which appears to have been very common in the legislation of the middle ages. If any dispute arises between the master and a seaman the master cannot discharge him until he has denied him his mess at three consecutive meals. But if the seaman repents, and offers to repair his fault to the satisfaction of the crew, the master is bound to pardon him and receive him into favor, and if he does not, but discharges him, the seaman may follow the vessel to her port of discharge, and recover his whole wages to the termination of the voyage. Ed. Pardessus, arts. 12, 14. "The master," says Cleirac, "ought to treat his men kindly, and not use towards them irritating and injurious language; and if any dispute or quarrel arises, before discharging a riotous and disorderly man, he ought to permit him to re-

main a day and a half on board, or during time of three meals, that he may have time to sleep upon his offence, and if in that time he acknowledges his fault, offers to repair it, and submit to the judgment of the rest of the crew, the master is bound to accept the satisfaction." Cleirac sur Jugemens d' Oleron, art. 13. The early maritime legislation of the Low Countries, under the name of the Jugemens de Damme, or Laws of Westcapelle, is copied from the Roles of Oleron, which appear to have been received as a sort of common law in all the western ports of Europe. The provisions which have been mentioned, relating to the powers and duties of the master to maintain discipline and subordination on board the vessel, are transcribed for the government of their mercantile marine, without alteration. Articles 12–14. The Ordinance of Wisbuy contains substantially the same provisions with the Judgments of Oleron. It requires a seaman to submit to one blow from the master, but authorizes him to defend himself if it is repeated. It prohibits the master from expelling a seaman from his ship until he has denied him his mess, and requires him to pardon him if the man offers reparation for his fault to the satisfaction of the rest of the crew. Ed. Pardessus, arts. 26–28. By the Laws of the Hanse Towns, if a seaman is guilty of insolence or unfaithfulness to the master, which shall be proved by the testimony of two of the crew, he may put him ashore if the master thinks proper, provided it is in an inhabited place, and the rest of the crew are bound to continue to do their duty, under the penalty of losing their wages, and a more severe punishment to be inflicted by a magistrate. Reces, 1591, art. 30, Ed. Pardessus; Reces, 1614, tit. 3, art. 8. "Yet this punishment," says Kuricke, "is not to be inflicted for common, but only for highly aggravated offences." Comm. in Jus. Hans. tit. 3, art. 8, pp. 709, 710. The Ordinance of Charles V. for the Netherlands, 1551, requires the subordinate officers and the seamen to be obedient to all the orders of the master, and whoever is guilty of disobedience, mutiny, or neglect of duty, is liable to be punished by a fine of six carolines, one half to go to the public treasury, and one half to the master; and if their disobedience has been accompanied with grave offences, they are liable to a severer punishment, even capital, according to the aggravation of the offence, but the punishment is to be inflicted, it is apparent, not by the order of the master, but by that of the magistrate. Articles 1–3, 10.

One cannot avoid observing how careful all these laws are, in avoiding the direct mention of any legal authority of the captain to correct, by corporal chastisement, the misbehavior of mariners. But though not directly mentioned, it seems either to have been inferred, or to have become silently established, by usage. Casa Regis, as he is quoted by Valin, says that the master has but a moder-

ate authority for discipline over his men, extending but to a slight chastisement, for the purpose of correcting their insolence, immorality, or licentiousness, such as a parent has over his children, or the master over his servants. 1 Valin, Comm. 449. The Ordonnance of Louis XIV. has a particular article on this subject. It authorizes the captain, by the advice of the mate and pilot, to punish mutinous, drunken, and disobedient seamen, those who maltreat their companions, or commit faults of that description during the voyage, by ducking, or putting them in irons, and by similar punishments. Liv. 2, tit. 1, art. 22. The ordonnance is still in force, except so far as it has been derogated from by special laws, in all that relates to maritime police. Boulay Paty. Cours de Droit Maritime, vol. 1, 375. Over offenses of a graver character, the captain has no authority, and it is his duty to secure the offenders and deliver them over to the laws. Valin, in his commentary on this article, says, "that the greatest abuse is not in a failure to denounce these higher offenses, but it is in the license which captains allow themselves to maltreat, with or without cause, such of their men as have been guilty of what they consider offenses. Some have proceeded even to such a degree of brutality as to knock down these poor wretches, who, on their return, most commonly dare not enter a complaint, because it has happened that some, for having done it, have been sent to prison by the commissaries of the marine." "Such abuses," says he, "will not fail to be multiplied, if the power of the tribunals is so little felt as to leave the police of ships to a purely arbitrary discretion." Valin, Comm. p. 448. Abbott, in his Law of Shipping (pages 136, 137), after stating that the seamen are bound to obey the commands of the captain in all lawful matters, says, that "in case of disobedience or disorderly conduct, he may lawfully correct them in a reasonable manner, his authority in this respect being analogous to that of a parent over his child, or a master over his apprentice or scholar. But it behooves the master, in the exercise of it, to be very careful and not make his parental power the pretext for cruelty and oppression." After quoting the French Ordonnance, which requires the captain to take the advice of his under officers before he proceeds to punish, he adds, that "such consent is not required by the laws of England; nevertheless, the master should, except in cases requiring his immediate interposition, take the advice of the persons next below him in authority, as well to prevent the operation of passion in his own breast, as to secure witnesses to the propriety of his conduct. For the master may be called upon by an action at law, on his return to his country, to answer to a mariner who has been beaten or imprisoned by him or by his order, in the course of a voyage, and for his justification he should be able to show not only that there was suffi-

cient cause for chastisement, but that the chastisement was in itself reasonable and moderate; otherwise the mariner may recover damages proportionate to the injury received." The law, as it is here laid down by Abbott, has been recognized in a variety of decisions by the courts of this country. Relf v. The Maria [case No. 11,692]; Thorne v. White [Id. 13,989]; Jarvis v. The Claiborne [Id. 7,225]; Sampson v. Smith, 15 Mass. 365.

I have referred to the ancient maritime ordinances and to authors of established reputation in foreign maritime law, not because they are of binding authority in our courts, but because they serve to illustrate our own law by throwing over it the illustration of an enlightened foreign jurisprudence; because the general rules of maritime police, on board merchant vessels, have a great similarity among all maritime nations, and because the customs and usages of the sea constitute the general substratum of our own maritime law; but more particularly to show the impression which the common practice of masters, the common habits of maritime persons, the ordinary current of experience of the sea service have made on the minds of those who are most familiar with the spirit of the maritime law, and most conversant with the habits and usages of masters and seamen. The result is not such as should encourage masters to resort, on trifling or common occasions, to their highest authority; an authority which the law only intrusts to them from necessity, and over the abuses of which it will watch with a prudent jealousy. But though the law does not encourage the master in hasty and harsh measures, though it enjoins upon him calmness and moderation in his deportment towards seamen, it justifies, in proper cases, moderate correction. The simple and somewhat rude character of seamen, partaking in a measure of the violent and tempestuous nature of the element on which they spend their lives, renders a prompt and energetic government indispensably necessary to good discipline. There is good sense in the remark of one of the latest and most valuable French writers on maritime law, on this subject. "A seaman," says he, "will never be a good mariner unless he is governed with rigor. It is impossible to hasten a manoeuvre, if the command may not be accompanied with coercive means. Here neither gentleness nor politeness are in place, the punishment of the moment is necessary to quicken the caviller and the lazy; if tardy, it will not accomplish the work nor ward off the danger." 1 Bouley Paty. Cours de Droit Maritime, 374.

When it is apparent that punishment has been merited, I have never been in the habit of attempting to adjust very accurately the balance between the magnitude of the fault and the quantum of punishment. Unless unusual or unlawful instruments have been used, or there have appeared clear and unequivocal marks of passion on the part of

the captain, or the punishment has been manifestly excessive and disproportionate to the fault, I have not thought myself justified in giving damages. It would be holding the master to too severe a rule to amerce him in damages, because in a case where punishment was deserved, he may, in the opinion of the court, have somewhat exceeded the limits of a moderate and reasonable chastisement. The nature of the subject does not admit of any precise or exact measure, and the court cannot, without great injustice, make of its judgment a bed of Procrustes, and require of all masters an exact conformity with it. Something is to be conceded to the excitement of the occasion under which the master is required by the duties of his office to exercise this authority; some consideration allowed to the general character and temper of the man who is the subject of punishment; some latitude for differences of judgment, and something presumed in favor of a rightful and proper exercise of discretion; and when the propriety and legality of correction of some kind is made to appear, it lies on the libellant to show that the punishment under all the circumstances of the case was clearly excessive. But in the present case, I can see no evidence of a fault that deserved corporal chastisement. There was something said on deck of the libellant's wetting the captain in the boat. But it was in proof that there was a fresh wind that evening, that the libellant held the weather oar; and all know, that under such circumstances the spray, without any culpable negligence of the oarsman, may sometimes be blown on a person in the stern of the boat. With respect to his turning the blade of his oar aft instead of forward, the reason was given for it by the witness; but even if the reason did not exist, it was not surely a fault that merited such severity of punishment. The scuffle that took place in the boat was so imperfectly seen by the witnesses, and that only at its close, that from the evidence little more is learnt with certainty about it, than that it commenced with a blow given by the captain. If, says Judge Peters, the captain commences a dispute with illegal conduct, or in an improper manner, he risks the consequences. 1 Pet. Adm. 175 [Thorne v. White, Case No. 13,989]. No one can doubt that the assault on the libellant in the boat, in the night time, was, under the circumstances, improper. If punishment was merited, that was neither the time nor the place to administer it. When the captain came on deck, can any one question the gross impropriety of his placing himself at the head of the steps to encounter Butler as he came up, of his taking this opportunity to administer correction? As little can he be justified in pursuing him and putting him in irons, and in beating him with a rope in an excess of passion, while he was manacled. Except when he was in the boat I see not the slightest evidence of

Butler's offering any resistance to the captain, not the least proof of a mutinous nor disobedient temper; nor does it appear that he had exposed himself to any particular censure at any other time during the voyage, except that he was not so able and active a seaman as some of the others of the crew. I decree forty dollars damages, with costs.

[NOTE. Flogging on board vessels of commerce was abolished by act of September 28, 1850 (9 Stat. 515; Rev. St. 4611).]